UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,    :    **OPINION AND ORDER**
    :    **DENYING DEFENDANT'S**
    -against-    :    **RULE 29 MOTION, AND**
    :    **GRANTING DEFENDANT'S**
ALYSHA LOPAC,    :    **RULE 33 MOTION**
    :
    Defendant.    :    S5  04 Cr. 119  (AKH)
-------------------------------------------------------x
ALVIN K. HELLERSTEIN, U.S.D.J.:

On February 5, 2004, the government filed an indictment against thirteen defendants alleging a conspiracy to import marijuana from Mexico into Tucson Arizona, and from Tucson, to New York City, Detroit, and Atlanta. The conspiracy was alleged to have lasted three years, from early 2001 to 2004; to involve "safe" houses in residential neighborhoods as distribution bases where members of the conspiracy could live and work; and to transport the marijuana in innocuous-looking packages sent via Federal Express and United Parcel Service, consigned from fictitious companies in Tucson to similarly fictitious companies at apparently innocent addresses in New York.

By the time trial began, on May 9, 2005, five defendants had pleaded guilty, one had died, two were cooperating witnesses, and three were fugitives; only three defendants remained: Chris Hensley, a/k/a Diesel, a/k/a Why Not; Omar Locke, a/k/a Slomar, a/k/a Chizle; and Alysha Lopac. A fifth superseding indictment alleged the crimes charged against these three defendants: their membership in the overall conspiracy that was pleaded in the original indictment; an additional substantive count against Locke accusing him of using a gun in connection with a narcotics crime, that is, the conspiracy to distribute marijuana; and an additional substantive count against Lopac accusing her of distributing, or possessing with intent to distribute, 8.2 kilograms of marijuana.

The trial lasted ten days. Hensley became a fugitive during trial but, after a day of

waiting, the trial continued in his absence. The verdict was delivered May 23, 2005 after a day of deliberations. In absentia, Hensley was found guilty of the conspiracy count. Locke was found not guilty of either the conspiracy or gun possession counts. Lopac was found guilty of both the conspiracy and possession counts.

Defendant Alysha Lopac moved promptly for the entry of a judgment of acquittal of the jury's verdict finding her guilty of conspiracy or, in the alternative, for a new trial. Fed. R. Crim. P. 29(c), 33. Her motion does not ask for relief with respect to the jury's verdict finding her guilty of the possession count. I hold, after thorough review of the testimony and exhibits, that she is not entitled to the entry of a judgment of acquittal on the conspiracy count, but a new trial on that count is warranted.

## I.      The Narcotics Conspiracy

Between early 2001 and January 2004, Edward Ho-Young, a resident of the United States and a national of Jamaica, and at least twelve of his friends and relatives, conducted a thriving marijuana business. Operating from a two-family residence on Union Street in Brooklyn, which they called their "base," and using "safe" houses in Tucson Arizona and Queens New York, the business imported marijuana from Mexico, packaged and treated it to neutralize distinctive odors, and shipped it to the distribution center in Brooklyn, and to alternate distribution points in Detroit and Atlanta. From its Brooklyn base, the group repackaged the marijuana and sold it in five and ten pound lots, wholesale for distribution in New York City and, from Detroit and Atlanta, for distribution in those cities.

## II.      The Original Indictment

The original indictment, filed February 5, 2004, alleged that over a three-year period, between 2001 and 2004, defendant Edward Ho-Young and at least twelve others conspired with one

another to violate the narcotics laws of the United States, to distribute and to possess with intent to distribute a controlled substance, to wit, more than 1,000 kilograms of marijuana. The indictment alleged that the conspiracy was carried out by a well-organized web of connections stretching from Arizona to New York City, Detroit and Atlanta.

The operations in Arizona, allegedly supervised by defendant Rickardo Tummings, a half-brother of Ho-Young, imported the marijuana from suppliers in Mexico, repackaged it for overnight delivery by general delivery services, and trans-shipped the marijuana to points of sale throughout the United States. Defendant Monique Miller was responsible for delivering the packages from the base in Tucson to the general delivery services.

The operations in Detroit were overseen by an unidentified, never arrested defendant, a person whose first name was Dion and whose last name was unknown, hence, "Dion LNU." Defendant Dean Bruce oversaw the operations in Atlanta. Defendant Michael Hurst, another half-brother of Ho-Young, allegedly oversaw the New York operations.

A number of people, recruited and managed by Michael Hurst, lived and worked in a two-story residence, their "base" of operations, at 1246 Union Street, Brooklyn. Marijuana sales were alleged to have been conducted from the basement by defendants Chris Hensley, Lloyd Haynes, and Omar Locke and an unidentified, never arrested defendant, Calvin Ford, all of whom lived and/or worked at the residence. Several of the defendants allegedly provided security, including defendants Dean Bruce, Chris Hensley, Calvin Ford, Lloyd Haynes, and Andrew Hurst, Michael Hurst's brother and Ho-Young's half-brother. Michael Hurst allegedly collected the marijuana at various addresses around New York City, and delivered the marijuana to the base for unpacking, bagging, and wholesale and retail selling by the other defendants who lived and worked there. Defendants Brandi Megens and Alysha Lopac were alleged to have been involved in

receiving packages at certain of those several locations, which were then collected by Michael Hurst for transport to the base.

## III.    Pre-Trial Dispositions

By the time trial began, five of the thirteen defendants who were originally indicted had pleaded guilty.   Another defendant had died, three remained fugitives and two functioned as government cooperators, leaving only three defendants for trial: Chris Hensley whom the indictment identified as a member who lived at the base and sold marijuana; Omar Locke whom the indictment identified as a member who lived at the base and provided security; and Alysha Lopac whom the indictment identified as a member who received packages of marijuana for the conspiracy, knowingly and with the intention to further the conspiracy.   On April 28, 2005, shortly before trial, a fifth superseding indictment was issued treating only these three defendants.

## IV.    The Fifth Superseding Indictment

Count One of the fifth superseding indictment charged Lopac, Locke, and Hensley with the conspiracy to distribute marijuana as alleged in the original indictment in violation of Section 846, Title 21, United States Code.   Count Two charged Lopac with distribution or possession with intent to distribute at least 8.2 kilograms of marijuana in violation of Section 841(b)(1)(D), Title 21, United States Code.   Count Three charged Locke with using and carrying a firearm in furtherance of a drug trafficking crime in violation of Section 924(c), Title 18, United States Code.   A jury was selected, and trial began, May 9, 2005.   The trial lasted ten days. Following deliberations lasting one day, the jury returned a verdict, on May 23, 2005, finding defendant Hensley guilty in absentia of the conspiracy count, finding Locke not guilty of both the conspiracy and gun possession counts, and finding Lopac guilty of both the conspiracy and the possession counts.   Both Hensley and Lopac were found guilty of conspiracy to distribute, or to

4

possess with intent to distribute, more than 100 kilograms but less than 1,000 kilograms of marijuana.

## V.     The Evidence Presented at Trial

The government's evidence consisted of (1) the testimony of two cooperating witnesses, Everton Powell, a/k/a Everton Carter, Lopac's boyfriend at the time, and Dean Bruce a/k/a Two Piece; (2) the testimony of New York City Police Department Detective Michael Johnson, who arrested Lopac and obtained her signature on a post-arrest statement; (3) the testimony of Drug Enforcement Agency Special Agent Timothy Larkin, who aided in the investigation; (4) the testimony of Federal Express Operations Manager John Defelice, who testified to its delivery protocol; (5) the testimony of Joseph Mogenis, senior computer scientist at Computer Science Corporation, who testified to information he collected from cellular phones; and (6) records and charts consisting of delivery receipts, summaries of delivery.

Powell testified that he and Lopac met in December 2001 at a dance club (Tr. at 298) and that they quickly became intimate (Tr. at 410).  Powell hid his involvement in narcotics from Lopac, and told her that he was in the music business (Tr. at 409).  They visited at each other's residences: at Lopac's apartments on West 76th Street and East 30th Street in Manhattan; and at Powell's residence at 1246 Union Street in the Crown Heights section of Brooklyn (Tr. at 442, 411).  Powell did not tell Lopac that the Union Street house, a two-family residence, was a base for marijuana distribution.  During Lopac's visits with Powell at his Union Street residence, Powell and his co-residents and their guests partied, watched television, and smoked marijuana, but no sales of marijuana occurred during Lopac's visits and there was nothing evident to suggest marijuana distribution activities (Tr. at 411-12).  To the question if Lopac ever smoked marijuana, Powell answered to one instance, when "I took her upstairs I rolled her a joint" (Tr. at 412).

Sometime later, in the Spring of 2002, Powell left New York for Tucson, to help defendant Rickardo Tummings supervise the Arizona operations, and to succeed to Tummings' position (Tr. at 332). At some point, Powell told Lopac that he was involved, not in music, but with marijuana (Tr. at 409). Their relationship continued. As Powell described it, it was "an int[imate] relationship" "but [they] still had not got engaged" (Tr. at 410 (incorrectly transcribed as "an intermittent relationship")). Powell traveled to New York frequently, once or twice a month, and visited Lopac during his trips (Tr. at 296). Lopac twice traveled to Tucson to visit Powell, paying her own expenses both times, once for a weekend, and the second time for a day or a day and a half (Tr. at 420-21, 610). Powell testified that he told her "that I miss her, and she volunteered to see me" (Tr. at 420). There is no indication that she witnessed or participated in any aspect of Powell's drug business during either trip. To the question, "was Ms. Lopac involved in the business in any way at that time period," Powell answered, "no" (Tr. at 421).

Lopac gave generously to Powell when he was in need. She gave him $1,500, but he never repaid her (Tr. at 611). She let Powell use her credit card, charges for which he never reimbursed her (Tr. at 611). She bought a cellular phone for his use and paid his cellular phone bills, also without recompense (Tr. at 448). In contrast, when, in 2003, Lopac was short of funds and asked Powell for help, he told her he "didn't have any money to give her" (Tr. at 611). Powell testified that Lopac was disappointed (Tr. at 612).

Sometime in mid-2002, probably in late Spring or early Summer, Powell asked Lopac if she would receive a box for him at her residence. At the time, she was residing at the Best Western Hotel on West 48th Street in Manhattan. Powell told Lopac that Michael Hurst, whom she knew to be a friend of Powell, would pick it up (Tr. at 427). Lopac agreed. She had met Michael Hurst while visiting with Powell at his Union Street residence, and Hurst was dating one of Lopac's

girl friends (Tr. at 422). Powell did not tell Lopac that there was marijuana in the parcel (Tr. at 428) and there is no evidence that Lopac had independent knowledge of the contents of the parcel. On the label of the parcel, delivered by United Parcel Service, the name of a company appeared, and the parcel was addressed to Lopac, not to Powell. Michael Hurst came to retrieve it and offered Lopac $500 for her trouble. Lopac refused to accept any money (Tr. at 429).

"Months later," Powell testified, in early 2003, he asked Lopac again "if she could receive a box from me." Lopac was living then in an apartment on West 76th Street in Manhattan, and told Powell, "no problem" (Tr. at 430). Two small boxes arrived via Federal Express, and Michael Hurst came for them. Lopac was not paid for her efforts and, after having rejected Michael Hurst's earlier offer, she was not offered money again. The government did not present evidence that Lopac knew the contents of the packages delivered to her. She could have observed, however, that the label showed the names of companies as both the sender and the intended recipient (Tr. at 432).

Powell testified that he sent "additional boxes to Ms. Lopac in 2003," two or three times "every month from about February 2003 until about November 2003" (Tr. at 433). There was no testimony, however, that Powell told Lopac that he was sending additional packages to her, and the circumstances, discussed below, made it doubtful that she knew much about these packages. Powell testified that Lopac moved several times during the period in which he sent packages to her. First, she lived at West 76th Street in early 2003; next she moved to East 30th Street in April 2003, where she lived for a couple of weeks; finally she moved to West 123rd Street, where she lived until her arrest, and maintained the East 30th Street apartment as a place of business.

When Lopac moved from West 76th Street to East 30th Street, Powell asked Lopac if he could assume her lease to her West 76th Street apartment and reimburse her for the amount of

the security deposit paid to the landlord, approximately $3,000, and Lopac agreed (Tr. at 434).

Thus, Powell was able to continue sending packages of marijuana to Lopac's former address on

West 76th Street, using Lopac's or other names as addressee, without her knowledge and without

asking her permission, but essentially sending packages to himself (Tr. at 614). Powell and his

conspirators in Tucson sent numerous packages, containing approximately 86 kilograms of

marijuana, to the West 76th Street apartment after Lopac had moved (Gov't Ex. 2,000A).

Powell testified that from May 2003 to November 2003 he continued to send boxes

addressed to Lopac, but delivered essentially to himself, at the West 76th Street apartment after he

assumed the lease from Lopac, and to Lopac's two new addresses, at East 30th Street and at West

123rd Street. According to Powell's testimony, Michael Hurst and Chris Hensley went to the West

76th Street and the East 30th Street addresses to "wait on [the] boxes," and pick them up (Tr. at

438). At the East 30th Street address, a friend and roommate of Lopac, Brandi, often received the

packages (Tr at 615) and the superintendent of the building received them as well (Tr. at 613). In

total, Powell testified he sent ten to fifteen boxes addressed to Lopac at her West 76th Street

apartment, about thirty to forty boxes to West 30th Street, and about two boxes to West 123rd Street

(Tr. at 436).

Powell testified that the conspirators in Tucson made an arrangement with Federal

Express not to require a signature or other receipt by the addressee. That made it unnecessary for

any particular person to identify himself at the point of receipt. Thereafter, packages could be left at

the door, or in a downstairs vestibule, or with the superintendent, regardless to whom the package

was addressed (Tr. at 613).

Powell admitted that he did not know how many, if any, of the packages that were

sent were accepted by Lopac (Tr. at 615). On cross-examination, Powell was asked to make clear

which of the deliveries were arranged for pick-up by Lopac.  Powell testified that there were only two or three: one on December 1, 2003; one "a couple months," less than a year, earlier; and an earlier one when she was living at the Best Western (Tr. at 608-09).  When asked if he ever told her what was inside the boxes, he responded, "no" (Tr. at 440, 603).  He testified that he referred to the boxes with Lopac over the phone as "C.D.s" or "girls," but the context of the reference, or whether it was to one or all the deliveries, was not stated (Tr. at 440).

Powell testified that, at some time, he visited Lopac, her roommate Brandi, and Dexter, a friend to both the women, at the East 30th Street apartment (Tr. at 442).  Brandi and Dexter were smoking marijuana.  Powell asked them to stop, explaining that he was expecting a Federal Express delivery to arrive, and he didn't want the deliveryman to smell the marijuana smoke.  Later, Powell and Dexter left together, and Powell testified that he and Dexter agreed that Powell would sell marijuana to Dexter (Tr. at 444).  There is no indication that Lopac knew of Powell's conversations with Dexter.

Powell testified that on another occasion he asked Lopac to purchase a kitchen scale for him, and she did.  Later, when Lopac was not in the apartment, Powell testified, a box came for him from Federal Express.  He opened the box in front of Brandi and Dexter, weighed it, and sold five pounds of marijuana to Dexter.  Powell testified that when Lopac heard about the event, she called Powell and berated him.  As Powell put it, Lopac was "pissed off" by the way Powell used her apartment (Tr. at 446).

Government Exhibit 2,000A tracks all the deliveries of marijuana packages sent by the conspiracy through Federal Express.  As such, it includes deliveries made to addresses at which Lopac lived and/or worked.  Special Agent Timothy Larkin compiled the chart from delivery receipts and electronic summaries of delivery receipts that he received from Federal Express.

Larkin testified, and the government represented, that all entries in Government Exhibit 2,000A, other than a summary of the chart itself included on the last page, were sourced in exhibits in evidence. Tr. at 804. The chart lists the sender of each package, including the individual, business, and address; the addressee, including the individual, business, and address; and the signator, including the delivery address. The Federal Express records were admitted as Government Exhibits 1,800A, 1,800B, and 1,800C (Tr. at 672).

Though Government Exhibit 2,000A purports to be a summary of delivery receipts admitted into evidence, more shipments are shown on the chart than are located in the trial exhibits themselves. The chart lists 168 packages that were delivered. Fifty-one packages were destined for addresses at which Lopac was living and/or working; of these, only forty are represented by delivery receipts found in the bundle offered by the government and received in evidence; the remaining eleven delivery receipts for packages destined for Lopac's apartments are unaccounted.

Of the forty delivery receipts located in evidence, only twenty show signatures that, to the viewer, appear to match Lopac's signature (Gov't Ex. 1,800A, 1,800B), plus another for for packages that were delivered to West 76th Street after she had moved from there (Gov't. Ex. 1,800A).

During trial, Government Exhibit 2,000A was published to the jury, and the government argued from it extensively that Lopac was deeply involved in the conspiracy. The government did not discuss with the jury the discrepancies between the summary chart it prepared (Gov't Ex. 2,000A) and the underlying Federal Express records (Gov't Ex. 1,800A, 1,800B, 1,800C, and 1,800R). The government did not publish the underlying records to the jury, and the jury did not send for these exhibits during their deliberations. The jury requested to review the summary chart, Government Exhibit 2,000A, and Lopac's statement, Government Exhibit 301R

(Tr. at 1139), but not the underlying exhibits of the Federal Express records, which reflected what she actually may have received.

Federal Express Operations Manager John Defelice testified about the procedure for collection and identification of signatures and of signator information. According to that procedure, after the signator signs the receipt, the driver scans the signature and types in the name that the signator signed (Tr. at 675). To type in the signator's name, Defelice testified, the driver would either read the signature, or, if it was illegible, the driver "should ask the customer to clarify and spell it out for them" (Tr. at 675-76). The computer does not allow the driver to proceed without typing in the driver's interpretation or clarification of the signator information (Tr. at 677). On cross examination, Defelice clarified that the driver does not ask for proof of identification from the signator (Tr. at 679). Defelice also attested to the option, at the sender's request, to waive the requirement of a signature. In the case of such a waiver, "[t]he driver can leave the package at the location" without "the protection of having a particular person sign for the package" (Tr. at 679).

Agent Larkin testified to the summarizing of the Federal Express information in the summary chart, Government Exhibit 2,000A. He explained that he compared the scanned signature and the typed-in signator information. "I looked at the signatures, and if I could read the signatures, I put what was the most complete information into the summary" (Tr. at 824). After "visually look[ing] at the electronic and the written signatures," (Tr. at 824) he "took what [he] thought was the most complete information and . . . put it in the summary" (Tr. at 825).

The government made no attempt to account for inconsistencies between the summary and the actual delivery receipts. It did not present an expert to identify the available signatures as those of Lopac or other recipients. Arguing from Government Exhibit 2000A, the summary chart introduced by Agent Larkin, and without accounting for any of the discrepancies,

the government represented to the jury that Lopac was directly responsible for fifty boxes containing 462 kilograms of marijuana based on the totals represented in the chart (Gov't Ex. 2,000A). The government argued in closing that Lopac was a member of the conspiracy and was responsible for 740 kilograms, all as reflected in the chart (Tr. at 987). There was no effort by the government to compare the chart to actual delivery receipts, or to account for the absence of signatures by Lopac.

On December 1, 2003, Lopac, at Powell's request, went to the central Federal Express facility in Manhattan to pick up two packages intended for Powell. Powell had told her that he was not home when Federal Express attempted to deliver two packages to his West 76th Street apartment, and that the packages were waiting for him at the Federal Express central facility on West 42d Street in Manhattan (Tr. at 451). Powell did not know that the packages had been diverted by order of a joint federal/state task force, or that Detective Michael Johnson was posing as a Federal Express clerk (Tr. at 42). Lopac, unsuspecting, arrived for the packages and, when they could not be found, sought to leave, saying that Powell could come himself for his packages. Johnson, still in his pose as a Federal Express clerk, importuned Lopac to wait. When she did not, Johnson called Powell and urged Powell to call Lopac and ask her to return for the packages, which he did. Lopac returned to the Federal Express window, and Johnson produced the two packages (Tr. at 41, 42, 43). He asked Lopac for identification. Lopac showed her driver's license, and explained that she previously had lived at the West 76th Street apartment, and had changed her address on her license when she had moved (Tr. at 43). Johnson gave Lopac the two packages and, as she emerged from the facility, Lopac was arrested (Tr. at 44).

Immediately, Lopac offered to respond to the inquiries of the arresting officers (Tr. at 51). Detective Johnson took her to the station house for questioning. She spoke to him readily,

answering his questions about her relationship with Powell and what she knew about him and his friends. Detective Johnson questioned her for several hours, and reduced their conversation to two pages of notes. He asked Lopac to review the notes, and to affix her signature if they were substantially accurate. She signed, and Johnson's notes were admitted into evidence as Government Exhibit 301R (Tr. at 66, 158). Detective Johnson testified that the statement represented "a selection or portion of the things [Lopac] said to [Detective Johnson] over a number of hours" (Tr. at 206).

Based on his interview of Lopac, Detective Johnson noted that "Lopac met Everton [Powell] in a club . . . and became friendly [for] approximately 2 years." He also noted that "when [Powell] would miss his packages from FedEx, Lopac would go to the facility to pick them up." About the boxes she retrieved on that day, his notes indicate that "Lopac assumed that there were drugs inside the boxes but wasn't sure what it was. Lopac knows that Carter is a drug dealer." Detective Johnson wrote that "Lopac wouldn't be paid for picking up the boxes" and that "when Lopac and [Powell] discuss the packages they refer to them as the 'Girls' or 'C.D.s.'" Detective Johnson also recounted that "[Powell] resides at Lopac's old apartment on W 76st," and that "[Powell's] Nextel phone was purchased under Lopac's name." About the conspiracy, he wrote that "[d]rugs come from different Mexicans from Arizona and they transport to Everton['s] house in Arizona," "Mikey [a.k.a. Michael Hurst] and Sojie (Mikey's brother) [a.k.a. Rickardo Tummings] have FedEx packages into the New York area," and "[Powell] sends the money back to Arizona through the mail" (Gov't Ex. 301R).

In addition, Lopac prepared a statement for Detective Johnson of relevant names, contact information, and excerpts of their conversation. The list was admitted into evidence as Government Exhibit 304. She listed the information from her cellular phone's address book or call

records. She referred to Powell as "POW" and noted his Nextel cellular phone number, "1 646 852-1399," as "under my name." She listed three phone numbers for "Mikey," whose nickname she noted to be "Fire" and was later identified as defendant Michael Hurst: his cellular phone, 718-406-5462; his phone at his Dillon Street residence in Queens, 718-604-7052; and another cellular phone, 718-541-1868. Lopac wrote Mikey's "brother Sojie ships from [Arizona]," and Detective Johnson wrote that Sojie's name is "Karl possibly Middleton," who was later identified as defendant Rickardo Tummings. Lopac noted the address "1246 Union St, NOST/EPW," which Detective Johnson testified to be where "all these people lived at . . . where they all hung out in the basement . . . on the corner of Nostrand and Eastern Parkway" (Tr. at 77).

The government called Brian Patrick Ford, a computer scientist, who testified to information he attained from cellular phones confiscated in the investigation. Lopac's cellular phone memory showed numbers attributed to Michael Hurst and Rickardo Tummings. Chris Hensley's phone showed Lopac's telephone number (Gov't Ex. 78A).

When Powell testified, the government asked him to identify an organizational chart of the business that he had prepared at the government's request. He did not include Lopac in the chart as a member of the organization (Tr. at 606)

Based on the alleged insufficiency of the foregoing evidence, Lopac moves for the entry of a judgment of acquittal of the jury's verdict finding her guilty of conspiracy or, in the alternative, for a new trial. Fed. R. Crim. P. 29(c), 33.

## VI.    Standards of Review

Upon motion by the defendant, the trial court may consider setting aside the jury verdict and entering an acquittal after a de novo review of the evidence presented at trial. Fed. R. Crim. P. 29(c); United States v. Autuori, 212 F.3d 105,114 (2d Cir. 2000) (citing United States v.

Guadagna, 183 F.3d 122, 129 (2d Cir. 1999)). A "conviction must be allowed to stand if, 'after viewing the evidence in the light most favorable to the prosecution,' the reviewing court finds that '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). A court, when considering a Rule 29 motion, must "view[ ] all of the evidence in the light most favorable to the government," United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002), and defer "to the jury's choice of competing inferences that can be drawn from the evidence," United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). The evidence must be viewed as a whole. United States v. Reyes, 302 F.3d 48, 53 (2d Cir. 2002); Guadagna, 183 F.3d at 130. In short, the defendant shoulders a "heavy burden" in challenging the sufficiency of evidence supporting a conviction. Aleskerova, 300 F.3d at 292 (citing United States v. Samaria, 239 F.3d 228, 233 (2d Cir. 2001); United States v. Macklin, 927 F.2d 1272, 1277 (2d Cir. 1991)); United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994).

Upon motion by the defendant, the court also may consider setting aside the jury verdict and ordering a new trial "if the interests of justice so require." Fed. R. Crim. P. 33; United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (citing United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)) ("The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."). A court, when considering a Rule 33 motion, must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." Ferguson, 246 F.3d at 134. The court is not required to view the evidence in the light most favorable to the government, but rather is to weigh the evidence and determine the credibility of witnesses. United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (citing Sanchez, 969 F.2d at 1413; United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)), aff'd, 246 F.3d

129 (2d Cir. 2001).

The trial court has "broader discretion" to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29.  Ferguson, 246 F.3d at 134.  "[A] guilty verdict might survive a Rule 29(c) motion – because a rational jury, viewing the evidence through the government's eyes, could convict – but fail to meet the Rule 33 standard because the momentum of the evidence as a whole would make a guilty verdict irrational."  Id. at 139 n.1 (Walker, J., concurring in part and dissenting in part).  If the government fails in its proof, for example, of a defendant's having become a member of the conspiracy such that an acquittal ought to have been directed, the court has the power to direct a new trial rather than enter a judgment of acquittal.  Bryan v. United States, 338 U.S. 552, 559-60 (1950) (affirming Court of Appeal for the Second Circuit's ordering of new trial due to insufficient evidence).  However, if there is no reason to believe that "'the defect in the evidence might be supplied on another trial,'" acquittal may be a more appropriate judgment.  United States v. Steinberg, 525 F.2d 1126, 1134 (2d Cir. 1975) (Friendly, J., concurring and dissenting) (quoting Bryan, 338 U.S. at 559).

## VII.    The Law of Conspiracy

A conspiracy is an agreement between two or more people to commit a crime, in this case to distribute or to possess with intent to distribute marijuana.  Deference to a jury verdict is "especially important when reviewing a conviction of conspiracy," Pitre, 960 F.2d at 1121 (citing United States v. Nusraty, 867 F.2d 759, 762 (2d Cir. 1989)), given the secretive nature of conspiracies, which hinders the laying out of precise evidence.  Id. (quoting United States v. Provenzano, 615 F.2d 37, 45 (2d Cir. 1980)).  Here, the existence of a conspiracy was well evidenced by the government's trial proofs.

Once a conspiracy has been shown to exist, "'only slight evidence is required to link another defendant with [that] conspiracy.'"  Aleskerova, 300 F.3d at 292 (quoting United States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998)); United States v. Desena, 260 F.3d 150, 154 (2d Cir. 2001) ("Where the existence of a conspiracy has been proved, 'evidence sufficient to link another defendant with it need not be overwhelming and it may be circumstantial in nature.'").  The Supreme Court has made clear, however, that charges of conspiracy are not to be proven by "piling inference upon inference."  Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943) (warning against the fashioning of a "dragnet").

A.  *Knowledge and Intent*

Like all other material elements of a crime, the government must prove beyond a reasonable doubt both (1) that the defendant knew, or consciously avoided knowledge, of the object of the conspiracy, and (2) that the defendant acted with the specific intent to aid in the accomplishment of those unlawful ends.  See 21 U.S.C. § 846; United States v. Svoboda, 347 F.3d 471, 477 (2d Cir. 2003).

The jury was instructed to "determine if the government proved beyond a reasonable doubt that each . . . defendant[] not only participated in the activities of the conspiracy, but did so knowingly and intentionally, with awareness of at least some of the unlawful aims and purposes and in order to further its unlawful objectives" (Tr. at 1095-96).  Specifically, the jury was instructed regarding the two necessary elements of participation in a conspiracy:  "Knowledge of unlawful objectives of the conspiracy alone is not sufficient to prove an intention to participate.  There must be further proof that the defendant joined in the illegal agreement with the intent to help it succeed in its criminal purpose" (Tr. at 1098).  The jury was instructed that "[k]nowledge and intention are matters of inference from [the] facts proved" (Tr. at 1096).  Such inferences, the jury was

instructed, are to be made by "look[ing] at the acts, the conduct, the language that is used, and . . . decid[ing] by inference if the person acted knowingly and intentionally" (Tr. at 1096). Following an instruction defining conscious avoidance, the jury was told that "if you find that the defendant consciously avoided knowingly joining a conspiracy, it's not enough in order [to] find that one joined, you have to find knowledge and actual intent" (Tr. at 1098).

From the evidence presented at trial, the jury could have inferred that Lopac knew, or consciously avoided knowledge, that Powell and his friends and relatives were engaged together to distribute and to posses with intent to distribute marijuana, that is, that they were engaged in a conspiracy. Powell testified that he told Lopac that he was in the marijuana business, and Lopac could have inferred that Powell was working with his relatives and friends. Lopac's approval of Detective Johnson's write-up showed that she had at least notice from which she might have inferred that Powell sent drugs from Arizona to New York, and that Michael Hurst and Rickardo Tummings were involved in the shipments. Lopac also probably knew that Powell had a reason to use names of companies rather than his own name as shipper and recipient of the packages that Lopac picked up, and that the reason was probably an effort by Powell to disguise his involvement in criminal activity. The jury's finding that Lopac had sufficient knowledge of the conspiracy thus is sustainable.

However, the jury's finding that the government's evidence adequately proved Lopac's intention to join Powell's conspiracy is problematic. To establish the requirement of intent, "[t]here must be something more than 'mere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy.'" United States v. Cianchetti, 315 F.2d 584, 588 (2d Cir. 1963). The defendant must "in some way promote their venture himself, make it his own, [or] have a stake in its outcome." United States v. Falcone, 109 F.2d 579, 581 (2d Cir. 1940), aff'd 311 U.S. 205

(1940). "There must be proof that [the defendant] intended to join the conspiracy, that is, that he participated in it, or in some way made an affirmative attempt to further the conspiracy's purposes, or made it his own venture in the sense of having a stake in its outcome." United States v. Ceballos, 340 F.3d 115, 127-28 (2d Cir. 2003).

That "something more" required to sustain a finding of intent to further the conspiracy is not well defined, and largely fact dependant. On the one hand, mere presence and mere association are not enough to prove conspiratorial intent, United States v. Torres, 901 F.2d 205, 220 (2d Cir. 1990) (citing United States v. Chang An-Lo, 851 F.2d 547, 554 (2d Cir. 1988); Steinberg, 525 U.S. at 1134), but on the other hand, a showing that the defendant "was not indifferent to the outcome of the venture," even if he did not have a financial stake in the objective, can be sufficient. Torres, 901 F.2d at 245; see United States v. Henry, 325 F.3d 93, 105 (2d Cir. 2003). It all depends on the nature and context of defendant's involvement and his state of mind.

Proof of intent poses particular challenges with defendants who are on the fringes of a conspiracy. If such fringe defendants have a financial interest from which the court can infer intent to further the conspiracy, the sufficiency of a verdict of guilty generally is not difficult to discern. See, e.g., United States v. Rush, 666 F.2d 10, 11 (2d Cir. 1981) (financer receiving an "exorbitant and usurious profit"); Reyes, 302 F.3d at 55 (stolen-goods supplier paid "numerous checks" by retailer). Lopac, however, lacked a financial interest in the group's activities, or any stake in the achieving of those objectives, and received *no* financial payments for her favors to Powell. The typical inference of intent made from financial interests is not applicable in this case.

The presence of a financial stake in a criminal enterprise is not an absolute condition. Verdicts of guilty of defendants on the fringes of conspiracies who lack financial interests in the conspiracy can be sustained. Such verdicts, generally, fall into three categories: (1) where

participation in the activities of the conspiracy is clear and unequivocal, but where knowledge and, more specifically, intent are less clear; (2) where participation is limited and intent is inferred from association or presence with the conspirators; and (3) where the defendants on the fringe actively disassociate themselves from the criminal activity.

1.     The First Fringe Category:  Clear Participation and Unclear Intent

The first category, of clear participation and unclear intent, generally encompasses providers of services and goods who facilitate the criminal objectives of the conspirators, often without specific intention to further the ends of their conspiracy.  For example, in United States v. Zambrano, 776 F.2d 1091 (2d Cir. 1985), the defendant was convicted of conspiring to use counterfeit credit cards and to commit wire fraud.  The evidence supporting the jury's verdict showed that the defendant sold blank credit cards and delivered them to the conspirators in a clandestine manner.  The Court of Appeals upheld the verdict, holding that the evidence of selling blank credit cards and of operating in a clandestine manner sufficiently proved the defendant's intention to join the conspiracy and to help make it succeed.  Id. at 1096-97.  In contrast, Lopac's activities were ordinary, and there was nothing clandestine about her willingness to accept deliveries as a favor to Powell, her friend and lover.

In reaching its decision in Zambrano, the Court of Appeals reasoned from two relevant Supreme Court precedents.  In Falcone, the Supreme Court affirmed a decision by the Court of Appeals for the Second Circuit overturning a conviction for conspiracy to produce alcoholic beverages, where the defendants, in the regular course of their jobber and distribution businesses, sold sugar, yeast and other similar commodities to operators of illegal stills.  311 U.S. at 206-07.  The Court of Appeals assumed that the defendants reasonably knew that the products they sold were likely to be used for manufacturing whiskey, but found no sufficient proof that defendants

intended to join the illegal enterprise. 109 F.2d at 580-82. The Court of Appeals held that a

defendant, in order to be considered a member of a conspiracy, must "in some sense promote their

venture himself, make it his own, [or] have a stake in its outcome," and that failure to prove such an

intent was ground for reversal. Id. at 581-82. It held that merely to sell articles of free commerce to

distillers was "*toto coelo* different from joining with them in running the stills," id. at 581, and thus

the Supreme Court ruled there was insufficient evidence to sustain a conviction of conspiracy. 309

U.S. at 211. Similarly, the conspirators did not consider Lopac a member, and Lopac made it clear

that she wanted no stake in whatever Powell, Hurst, and others might be doing with the packages.

In contrast, in Direct Sales Co., the Supreme Court upheld the jury's verdict, finding

that the government had proved that defendant intended to join the conspiracy to distribute drugs in

violation of the narcotics laws. In that case, the defendant, a mail-order wholesale drug corporation,

used high-pressured sales methods and quantity discounts to sell vast quantities of morphine. 319

U.S. at 713. The Court held that this was not a case of "single or casual transactions, not amounting

to a course of business, regular, sustained and prolonged, and involving nothing more on the seller's

part than indifference to the buyer's illegal purpose and passive acquiescence." Id. at 712 n.8.

That kind of case, it held, would not establish intent to further the illegal ends of a conspiracy, and

thus would not be sufficient evidence to support a conspiracy conviction. Id. ("A considerable

degree of carelessness coupled with casual transactions is tolerable outside the boundary of

conspiracy."). The Court upheld the jury's verdict because the proof of intention went well beyond

such facts.

The Court of Appeals for the Second Circuit, applying the reasoning of Falcone and

Direct Sales, held that "[t]he virtual exclusion of any possibility that the cards were to be used

legally coupled with [the defendant's] clandestine behavior constituted enough to allow the jury to

take the further step from knowledge to intent and agreement." Zambrano, 776 F.2d at 1096.

Consequently, the judgment of conviction was affirmed.  See also, United States v. Morgan, 385

F.3d 196, 205-06 (2d Cir. 2004) (finding intent of defendant to help virtual stranger import drugs,

though defendant claimed to think she was importing clothing, based on (1) knowledge of contents

of bag indicating awareness that bag contained drugs; (2) receipt of large payments by a virtual

stranger; and (3) obscure travel plans and deviations).  Similarly, in Rush, a medical doctor lent

$25,000 to his two alleged coconspirators, who used the money to finance the purchase of drugs and

paid Dr. Rush $15,000 "interest" for the short term "loan."  666 F.2d at 11.  Rush claimed that he

intended to be only "a lender to profit from a loan transaction," and "lacked the intent of a criminal

to enter into or to effectuate an agreement to violate the laws of the United States."  Id.  The court

found, however, that in (1) embarking upon a new line of business, (2) knowingly lending money at

high interest to drug dealers, and (3) doing so in a clandestine manner, he evidenced the necessary

intent to promote and cooperate in their scheme.  Id. at 11-12.

   In contrast, in Samaria, the Court of Appeals reversed the jury's verdict, holding that

the evidence was insufficient to prove an intention to join a conspiracy.  The defendant was a gypsy

taxi driver.  Twice, he drove his alleged coconspirators to pick up unmarked packages containing

illicit goods from Mailboxes Etc., a company that offers package receipt and delivery services.

That he assisted the conspirators was clear.  The issue of guilt involved his subjective intent and, on

that crucial issue, the Court of Appeals held that the proof was insufficient, failing to satisfy a set of

normal indicia of membership.

> The government may, for example, offer . . . evidence that the
> defendant participated in conversations directly related to the
> substance of the conspiracy.  A defendant may possess or be
> mentioned in documents important to the conspiracy. There may be
> proof that a defendant exercised authority within the conspiracy itself.
> A defendant may also be found to have received a share of the profits

> from the conspiracy. In some cases, a defendant may explicitly
> confirm the nature of the activity in which the co-conspirators were
> engaged.

239 F.3d at 235-36 (citations omitted); see also United States v. Maltos, 985 F.2d 743, 747 (5th Cir. 1992) (finding insufficient evidence of knowledge, notwithstanding proof that defendant (1) associated with individuals engaged in transport of cocaine; (2) was present during transport of two shipments; and (3) drove vehicle in which drugs were concealed in suitcase in trunk).

Finally, the court may find intent lacking where, despite the illicit nature of the goods, the level of a defendant's participation is too small to support a finding of intention to join a conspiracy. For example, in United States v. Berkery, 919 F.2d 817 (2d Cir. 1990), defendant Berkery sent a quantity of P2P from Germany to co-defendant Quinn. Both were convicted of conspiracy to manufacture methamphetamine by the district court, largely because P2P's only known use is in the manufacture of methamphetamine. Id. at 819. The Court of Appeals reversed, holding that a single instance of possession, even of a large quantity of P2P, was insufficient to sustain a conviction for conspiracy to manufacture methamphetamine. Id. at 821. The court determined that "[p]ossession of a large quantity of P2P leads just as naturally to a conclusion that appellants merely intended to distribute it to others rather than acting in concert to manufacture." Id. There was no proof that Berkery was interested in what happened to the P2P after it was delivered and paid for. Id. (citing United States v. Peoni, 100 F.2d 401, 403 (2d Cir. 1938)). Absent any continuing interest, the Court of Appeals held there could be no conspiracy to manufacture, for "without additional evidence of either connection with an actual manufacturing operation, or a pattern of importing activity," the mere sale and receipt of P2P "cannot support an inference that appellants Berkery and Quinn were parties to a[] . . . conspiracy to manufacture methamphetamine." Id. at 821-22.

Placing her case in this first category, Lopac argues that, like the defendant in Falcone, her receipt of innocuous-appearing packages does not show an intention on her part to join the conspiracy. The proofs evidenced none of the indicia of intent set out in Samaria. See 239 F.3d at 235-36. There was no evidence that Lopac participated in conversations related to the conspiracy, that Lopac possessed or was mentioned in conspiracy documents, that Lopac exercised any authority, or that Lopac received any profits or payments. The trial also evidenced such disassociating factors as those relied upon by the court in Berkery. The nature of the enterprise among Powell, Mikey, Sojie, and others was a highly lucrative, widely spread, well organized conspiracy to wholesale marijuana. Lopac expressed no interest in that conspiracy. She had no interest in the packages she received, or in their content, or in what might happen to them, or in being paid for doing favors. See Berkery, 919 F.2d at 821. She may have suspected that the packages Powell asked her to pick up contained marijuana, but there was no evidence that she had any stake in Powell's venture or cared about whatever use the ultimate recipients might make of the packages.

However, the extent of Lopac's involvement -- if more than the three random incidents to which Powell testified and if approaching the twenty or so instances reflected in a visual comparison of her signatures on Federal Express records -- is more than the courts have allowed in this first category of fringe defendants. "A pattern of . . . activity" may be suggested, see Berkery, 919 F.2d at 821-22, perhaps sufficient to allow the jury to find intent as well as knowledge. For the reasons soon to be discussed, this may be the issue for a succeeding trial.

2.      The Second Fringe Category:  Clear Knowledge, Unclear Intent and Participation

The second category of cases involves defendants whose participation in conspiratorial activities is limited and whose intention to further the illegal objectives of the

conspiracy is unclear.  The difficulty in these cases is that the defendant, because of his association with the conspirators or his presence at the scene of the criminal conduct, was probably aware of the existence of the conspiracy.  This blend of adequate knowledge but unclear intent generally results in reversals of convictions, on the ground that facilitation of the conspiracy, without intent to further the conspiracy, is not sufficient for conviction.  For example, in United States v. Evans, 970 F.2d 663 (10th Cir. 1992), the Court of Appeals for the Tenth Circuit reversed the conviction of defendant Brice, holding that (1) a single purchase of crack from the key distributor in the conspiracy, and (2) lending scales to aid the conspirators in weighing crack cocaine failed to establish that the defendant "shared in the common distribution objective of the conspiracy," even though she probably knew their intended use for the scales.  Id. at 673.  The Court of Appeals ruled that the two isolated pieces of evidence reflected not an intention to further the objectives of the conspiracy, but rather a mere "gratuitous favor or isolated act among friends."  Id. (citing United States v. McIntyre, 836 F.2d 467 (10th Cir. 1987)).  The Court of Appeals cautioned "that we must be particularly vigilant when the government seeks to bring many individuals under the umbrella of a single conspiracy.  The risk is that a jury will be so overwhelmed with evidence of wrongdoing by other alleged coconspirators that it will fail to differentiate among particular defendants."  Id. (citing United States v. Sperling, 506 F.2d 1323, 1340-41 (2d Cir. 1974)).

Another such example is United States v. Soto, 716 F.2d 989 (2d Cir. 1983).  In that case, the defendant, an immigrant had been living with her new-born baby for three weeks in an apartment that was the center of a drug distribution ring.  The conspirators used the apartment as a cutting mill, and stored drugs, drug paraphernalia, and a weapon in the same room where defendant lived.  Id. at 990.  The Court of Appeals reversed defendant's conviction.  She may have been completely trusted by the conspirators, as the government argued, but her trustworthiness was "a far

cry from her participation." Id. at 992. The conspirators did not include defendant among the list of employees maintained by the leader in his ledger books. Id. at 991. From the "total circumstances of how [she] came to reside there," id., and despite her knowledge of the conspiracy and her presence while the conspirators planned and carried out their illegal objectives, the court found that "the inescapable inference to be drawn from the evidence is that she never joined the conspiracy." Id. at 992 (citing United States v. Mehtala, 578 F.2d 6, 10 (1st Cir. 1978)). The evidence was insufficient to prove the defendant's intention to join the conspiracy, and that intention could not be proved by her knowledge of the conspiracy and its illegal objectives.

However, where knowledge and intent are clear, limited participation may be sufficient to sustain a conviction. In Torres, the defendant, Arcelay, appealing his conviction, argued that he "lacked the 'specific intent' to advance the conspiracy to sell heroin, but rather acted solely as a roommate and friend" of his alleged coconspirator. 901 F.2d at 222. His argument was rejected, for the record contained ample evidence of just such a specific intent. Thus, he (1) gave his name to a conspirator to enable him to purchase and register a car in Arcelay's name, and thus to mask his activities when he used the car in furtherance of drug trafficking; (2) allowed a conspirator, who was also his roommate, to use his name as a reference; (3) canceled the lease to an apartment and returned the key to the landlord to cover over the traces of the conspirators' use of the apartment in furtherance of drug trafficking; (4) frequently relayed messages for his roommates to other conspirators; and (5) assisted in locating a worker for a special assignment for the conspirators. Id. The Court of Appeals for the Second Circuit emphasized that once knowledge and participation were shown, "Arcelay's claim that his participation was motivated by friendship with Flores is irrelevant to the question of Arcelay's criminal liability." Id. at 223 (citing United

States v. Bagaric, 706 F.2d 42, 53 (2d Cir. 1983)). Arcelay's involvement in furthering the criminal activities made it clear that he not only knew, but also intended to further, the criminal activities.

Similarly, in Macklin, the evidence showed that the defendant, Swain, not only knew that the attic in his home was being used for a PCP laboratory, but also that he specifically intended to further the illegal objectives of the conspiracy. 927 F.2d 1272 (2d Cir. 1991). Thus, (1) the odor of the chemicals used in the attic was unavoidable, and was inconsistent with normal residential uses, evidencing knowledge; (2) Swain carried boxes of chemicals to his attic, evidencing participation; (3) paraphernalia for manufacturing was delivered to Swain's house, clearly to be used with the chemicals; (4) Swain smelled of chemicals, evidencing involvement in the manufacture of the PCP; and (5) Swain attempted to dissuade a key witness from testifying, evidencing consciousness of guilt. Id. at 1279. Upon the evidence, the Court of Appeals had no difficulty in concluding that there was sufficient evidence to sustain Swain's conviction for conspiracy to manufacture PCP. Id. at 1280.

Like the defendants in this second category of cases, Lopac's knowledge of the conspiracy among Powell and others to distribute marijuana is inferable from the evidence presented. If, as the evidence seems to suggest, her involvement was as much as twenty or so packages – less than the fifty-one packages argued by the government – the jury may be able to infer an intent to further the conspiracy as well, as in Macklin or Torres. As I mentioned above and will soon discuss, that may be the issue for a succeeding trial.

3.     The Third Fringe Category:  Disavowal of Intent

The third category of cases involves defendants who show unwillingness to associate themselves with the conspiracy, even though they may have been aware of the conspiracy surrounding them and its illegal purposes. For example, in Nusraty, the defendant, a taxi driver,

appeared at the airport to meet an arriving passenger who was to deliver drugs and was associated with the drug supplier, his brother.  The delivery, however, did not take place, because the taxi driver refused to accept a suit from the passenger in which the drugs he carried were stashed.  867 F.2d at 761.  The Court of Appeals for the Second Circuit reversed the conviction, ruling that the taxi driver had disavowed intent by refusing to accept the drugs.  Cf. United States v. Gordon, 987 F.2d 902, 907 (2d Cir. 1993) (finding sufficient intent where defendant, a taxi driver, acknowledged having money and being prepared to accept drugs).  Similarly, in Cianchetti, the court reversed a conviction of conspiring to distribute drugs based on insufficient evidence supporting a finding of specific intent.  315 F.2d at 588.  The jury had convicted defendant based on evidence that defendant had entered into arrangements to receive heroin from the conspirators.  However, the evidence showed only a conditional acquiescence by defendant, "[w]ell, maybe I could help you out.  I don't know."  Id. at 587.  The Court of Appeals for the Second Circuit reversed, ruling that "[r]ather than reveal[] a stake in the conspiratorial venture or an affirmative attempt to further its purposes, [the defendant's] statements of his intention were at least equivocal."  Id.  The Court of Appeals was unwilling to find more than that defendant "did not cast in his lot with the conspirators."  Id.; see also Steinberg, 535 F.2d at 1134 (finding "unequivocal[] disassociat[ion]" from conspiracy from defendant's expressing desire to not "'be killed'" and to have "'nothing to do with it'").

Lopac, like the defendants in Cianchetti and Nusraty, disavowed criminal intent by showing no interest to take part in any of the conspiratorial activities or to receive any benefit from the conspiracy, and in berating Powell for using her apartment to conduct a marijuana transaction.  See 315 F.2d at 587; 867 F.2d at 761.  When she learned that Powell had used her in asking her to pick up Federal Express packages that contained marijuana, she truthfully and voluntarily disclosed

all her knowledge without seeking to protect Powell or anyone else. Her continued receipt of packages, as evidenced in Government Exhibit 2,000A, could have informed the jury's finding of requisite intent. If she received packages on only three occasions, her disavowals of criminal intent might require an acquittal.

B.    *Discussion*

The government sought to prove Lopac's intent by arguing that she knew, or consciously avoided knowing, the contents of Powell's packages and, by implication, asking the jury to infer intent from her knowledge or conscious avoidance of knowledge. In doing so, the government argued excessively and inappropriately. There was no proof that, as the government stated, "customers come in, customers come out" during Lopac's few visits to Powell's residence at 1246 Union Street (Tr. at 957). There was no proof that Powell said to Lopac, as quoted by the government, "I'm in the weed business" (Tr. at 957). There was no proof that Lopac actually received on any particular day five boxes (Tr. at 958). There was insufficient proof that she was aware of the "20 more boxes" weighing about 280 pounds that were sent to West 76th after she moved from there (Tr. at 960), or that she was aware of "about 36 boxes weighing a total of about 615 pounds," some for which delivery receipts were not found in evidence or for which signatures do not match Lopac's (Tr. at 960). There is no proof that she received packages at two different addresses on the same day, for which the signatures were waived (Tr. at 961).

The government based these arguments on the chart, Government Exhibit 2,000A. However, as noted earlier, the chart was an inappropriate summary, and thus was unreliable evidence of the state of Lopac's knowledge. Powell's testimony tied her to only three packages, spread over the course of the three year conspiracy. Although a visual comparison of signatures in the Federal Express records leads to an inference that Lopac received more than the three packages,

perhaps as many as twenty or twenty four, no expert was produced to create greater reliability to those comparisons and, even then, the government charged Lopac with knowledge that was considerably more extensive than could be based on the Federal Express records actually in evidence.

The cases, and the instructions to the jury, require proof beyond a reasonable doubt of specific intent. Although, as the cases discussed above make clear, a defendant's participation in inherently wrongful activities can prove wrongful intent, caution must be exercised lest those engaged in normal associations and friendships become too readily inculpated. Evans, 970 F.2d at 673. Lopac did no more than receive Federal Express packages, innocently carried by Federal Express, wrapped in Federal Express labels, and often requiring no receipting signature. If the underlying Federal Express records had supported the government's arguments that Lopac was responsible for fifty one packages, there might be evidence of sufficient participation that could allow the jury to find intent. If only three receipts can be proven, as Powell's testimony supports, and he was in the best position to know, the argument for acquittal would be strong. Since, as I have discussed, the evidence suggests that Lopac may have signed for twenty or twenty four packages, her level of participation was more than would allow for an acquittal.

The jury found Lopac guilty of the count charging her with conspiring to distribute or to possess with intent to distribute more than 1,000 kilograms of marijuana, as well as the count charging her with possession with intent to distribute 8.2 kilograms of marijuana. Lopac challenges the former count, not the latter. The jury was instructed that, to reach a verdict of guilty in the former count, it had to find both guilty knowledge and specific intent, and Lopac does not challenge the accuracy of the jury charge. The evidence, as it stands, arguably may sustain the jury's verdict, in light of the very strong presumption in favor of jury verdicts, but only arguably. Pitre, 960 F.2d

at 1121.  However, in light of the inadequacy and misleading character of the proofs, specifically Government Exhibit 2,000A and the government's use of that exhibit, it would be a miscarriage of justice to allow the verdict to stand.  A new trial is ordered of the conspiracy count.

## VIII.   Rule 33 Motion

The sufficiency of evidence upon which I sustain the jury's conviction is a close call: Lopac was on the outermost fringes of a conspiracy, her knowledge was limited by a manipulative boyfriend, and she evidenced intentions inconsistent with joining a conspiracy.  In the interests of justice, a new trial is required.  Fed. R. Crim. P. 33.

The most important item of evidence in the case was the summary chart, Government Exhibit 2,000A.  The chart enabled the government to argue to the jury that Lopac's participation in the conspiracy was obvious and extensive.  It was part of the conspiracy's <u>modus operandi</u>, the government argued, to import marijuana into the Union Street base from diverse and otherwise unrelated, innocent sources.  The sources provided by Lopac's residences and places of work were principal sources, the government argued.

The chart was materially misleading in grossly overstating Lopac's involvement, knowledge and intentions. The government's summary chart listed 168 packages, of which fifty one were attributed by the chart to Lopac.  The bulk of the evidence at trial belied the inferences that the government argued from the chart.  Powell's testimony mentioned only three separate, random instances when Lopac actually received a package at Powell's request, and he was in better position to know than anyone else.  Lopac had no interest or involvement in the objectives of the conspiracy. She received packages on random occasions over a period of three years.  Packages often were intercepted by Michael Hurst or one of the other members of his conspiracy, or left with the superintendent, without knowledge of Lopac.  A waiver by Federal Express allowed delivery

without identification of the addressee, or even a signature of the addressee. And even where Lopac troubled herself to travel down to the Federal Express main facility on West 42nd Street to pick up a package, again as a favor to Powell, she was ready to leave when the package was not readily produced to her, and she had to be called by Powell and importuned to return to accept the package. When she learned that a marijuana transaction had occurred in her apartment during her absence, she called Powell to berate him. Lopac's behavior is consistent with personal favors to her manipulative boyfriend; it is not consistent with intent to further a conspiracy's objectives. The chart, by exaggerating the number and regularity of deliveries, misled the jury and encouraged it to infer that intent.

The testimony of Detective Johnson, to introduce his conversations with Lopac and his summary of what she told him, does not remedy the problem. Lopac, from the beginning, readily cooperated, and readily acquiesced in the written summary, for it repeated the main points of the undisputed facts. Nothing in the statement shows that she intended to join the conspiracy. All that it shows is that, in hindsight, she should have been aware that the packages she picked up likely contained marijuana. Such hindsight deductions are different from what she actually knew and did as evidenced by extensive testimony by Powell, the person in the best position to assess her knowledge. Hindsight deductions are also entirely different from what she intended. Her intention, as otherwise evidenced at trial, was to help out her boyfriend when he could not be present to receive ordinary-appearing packages. Detective Johnson's statement did not cure the misleading nature of the government's summary chart and the government's arguments based on that chart.

I charged the jury that it must find beyond a reasonable doubt that Lopac intended to further the conspiracy, that is that she acted "with specific intent to aid in the accomplishment of the unlawful objective" (Tr. at 1097), that is, with "intent to help it succeed in its criminal purpose"

(Tr. at 1098). The crucial question involved the interplay between Lopac's knowledge, to the extent she had knowledge, of the contents of the packages, evidenced by the number of packages that she actually received, or actually receipted with her signature, and the inference of intent that might, or might not, be drawn from that knowledge. The instructions to the jury, although correct and not objected to in their generality, did not sufficiently guide the jury with respect to the particular factual context of this case. Nor, because counsel did not highlight sufficiently the discrepancies between the summary chart and the actual Federal Express records, did the instructions adequately guide the jury in relation to the contradictions that were inherent in the documents, and between the documents and Powell's testimony. In the interest of avoiding a miscarriage of justice Lopac is entitled to a new trial of the conspiracy count. Fed. R. Crim. P. 33.

## X.    Conclusion

For the reasons stated, Lopac's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure is granted. Her motion for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure is denied, without prejudice to consideration again following any such retrial. The parties and counsel shall appear for a conference on January 26, 2006 at 10 am in Courtroom 14D, 500 Pearl Street, New York, New York, to set a trial date conforming to Section 3161(e), Title 18, United States Code, or such other proceedings as may be just and proper.

SO ORDERED.

Dated:     New York, New York
           January 18, 2006

                                        _____
                                        ALVIN K. HELLERSTEIN
                                        United States District Judge